## UNITED STATES v. FLEENOR.
### No. 9236.

Circuit Court of Appeals, Seventh Circuit.

Aug. 6, 1947.

MAJOR, Circuit Judge, dissenting.

———◆———

Howard C. Sandusky and Herman L. McCray, both of Evansville, Ind., and S. Rush Nicholson, Guy C. Shearer, and Robert Bibb Hardison, all of Louisville, Ky., for appellant.

B. Howard Caughran, U. S. Atty., of Indianapolis, Ind., and Maurice W. Graston, Asst. U. S. Atty., of Madison, Ind., for appellee.

Before SPARKS, MAJOR and KER-NER, Circuit Judges.

SPARKS, Circuit Judge.

Appellant was charged, in two counts, by grand jury indictment, in the Southern United States District Court of Indiana, with having in the year 1946, unlawfully, knowingly, willfully, and feloniously transported, caused to be transported, and aided and assisted in obtaining transportation for and in transporting in interstate commerce into the State of Indiana from another State, certain women for the purpose of fornication, adultery, debauchery and prostitution, in violation of the White Slave Traffic Act, 18 U.S.C.A. § 398. The first count related to the transportation of Geraldine Fleenor and Gladys Egan, alias Gladys Kellogg, from Peoria, Illinois, to Evansville, Indiana, on or about July 19, 1946. The second count related to the transportation of Sue Kearns from Henderson, Kentucky, to Evansville, Indiana, on or about August 16, 1946.

To each count of this indictment appellant pleaded not guilty, and the case was tried by a jury. At the close of plaintiff's evidence, appellant moved for a directed verdict of not guilty as to each count, which was overruled. This motion was renewed at the close of all the evidence, and was again overruled. The jury returned a verdict of guilty as to both counts, and judgment was rendered accordingly, with a penalty of five years' imprisonment, and a fine of $500 as to each count, and the sentences and judgments on the two counts were to run cumulatively and not concur-

rently. From this judgment this appeal is prosecuted.

Considerable stress is laid by appellant upon the conduct of the court in the trial of this case because at different times it plied certain questions to different witnesses. All but one of appellant's counsel appearing here conducted the trial in the district court, and no complaint whatever was there made concerning the conduct of the court in any respect, nor was it assigned there as a ground for appeal. However, we have studied the entire record, and we find no justification for such an assignment.

Further contention is urged by appellant that although the court instructed the jury that they were the sole judges of the facts and the weight and credit to be given to the various witnesses, that instruction in no wise served to correct the intimation as to the Judge's view and wishes made through his actions and comments during the trial. In this respect appellant says he does not question the sincerity and singleness of purpose of the Judge, *"but this is one of those rare cases where it was necessary for the Judge to rise above moral principles in order to perform his duty as a Judge."* After many years of experience both as a trial and a reviewing court it has never before been suggested to us that it was ever necessary for any court, under any circumstances, to rise above moral principles in order to perform its duties.

■■ Appellant contends that the court erred in its instruction on the question of reasonable doubt. This subject is covered by three consecutive paragraphs of the court's instructions. The objection is addressed only to a portion of the first paragraph, ending with a comma, without mentioning one word of the remaining portion of that sentence, or any part of the second and third paragraphs. It is elemental that instructions on any particular subject should be construed as a whole, and when that is done here we find no error whatever in this respect.

■ It is further contended by appellant that the court erred in instructing the jury with respect to the witnesses, as follows:

"Of course, you saw the witnesses on the witness stand, you have a right to look into their faces and determine the weight and credit to be given to the testimony of those witnesses, take into account the interest they may have in the outcome of this trial, the reasonableness of the testimony, and such other facts as will assist you in determining the weight and credit to be given to the testimony of the various witnesses who have testified in this case, and, finally, it is your responsibility to tell this court by your verdict whether or not this defendant is guilty as charged in the indictment." There was no error in this instruction.

■ Appellant further urges that the court erred in instructing as follows: "Now, the defendant did not testify. He had the right to testify or not as he saw fit, and the fact that he did not testify in this case must not be considered by you in determining his guilt or innocence because that was his right to testify or not as he saw fit." The instruction is correct, and there was no error in this respect.

■ Appellant further contends that the court erred in instructing the jury on the purpose of the alleged transportation of these women to Evansville, Indiana, from Peoria, Illinois, and Henderson, Kentucky. On this subject the court instructed as follows:

"Now, you can't take an X-ray of a man's mind, and tell what his purpose is, or what his intent is in doing any certain thing. That is something that exists in the mind alone. In determining that question, of course, you will take into consideration the acts, the things that are done, all for the purpose of you determining what was in the person's mind who did them. You, of course, will take into consideration the acts of these women as shown by the evidence in the case, just prior to the time they came into Indiana, the acts of these women as shown by the evidence, what they did immediately following their arrival in Evansville, and then from that determine whether or not if you find this defendant did aid or assist in transporting or furnishing transportation or transport them according to the statute, whether or not he did it for the

purpose of having them or any one of them engage in prostitution as charged in the indictment.

"Now, gentlemen, I am not going to discuss the evidence in this case. It did not take long to try it, but I want to say to you that circumstantial evidence is legal evidence, but when the Government relies upon circumstantial evidence as it apparently does in this case to show this defendant is guilty of transporting, aiding or furnishing transportation for these women in interstate commerce, the circumstances must be so convincing that you can arrive at no other conclusion than that of guilt before you can convict him on circumstantial evidence alone.

"So, consider all the circumstances, the association of these people together, at other places than in Indiana—Peoria, Illinois; Henderson, Kentucky; then Evansville, Indiana, and then from those circumstances, together with all other evidence determine whether or not the defendant is guilty as charged."

The basis of appellant's objection to this instruction is the first paragraph thereof, and again he does not mention nor does he seem to consider the following paragraphs. He urges that the jury was caused by the first paragraph to believe that proof of the acts of the women before they came into Indiana and after they arrived in Evansville, standing alone, was sufficient in itself as a basis for a verdict of guilty, and further that the jury was made to believe that reasonable grounds of belief on the part of appellant that they might engage in prostitution thereafter would constitute guilt to the same extent as would intent and purpose on his part that they should do so. We think the instruction as a whole conveys no such impression. It is elemental, however, that every one is presumed to intend the natural consequences of his own acts, and we are convinced that the evidence, to which we shall later refer, proved beyond a reasonable doubt that the natural consequences of appellant's acts in this respect, coupled with his intimacy and relations with, and knowledge of the parties here involved, both before and after these transportations, preclude any question that

these women were coming to Evansville with his assistance for the purpose of engaging in their nefarious occupation. We are convinced that the instruction was proper and that it in no way conflicts with the decision in Mortensen v. United States, 322 U.S. 369, 370, 64 S.Ct. 1037, 88 L.Ed. 1331.

Appellant tendered and requested no instructions, nor did he, in the District Court, interpose any objections whatever to any of those given by that court, or assign as error the giving of, or the refusal to give, any instruction as a ground of appeal.

The evidence in this case discloses that Geraldine Fleenor and Gladys Egan had known each other since childhood in Louisville, Kentucky. Both admitted they were and are prostitutes and, prior to the return of this indictment, had engaged in that business in Louisville, Kentucky; Peoria, Illinois; Evansville, Indiana, and elsewhere. The former was married to appellant on January 3, 1945, at Newport, Kentucky, and they lived for a short time in Covington, Kentucky. Gladys Egan, alias Gladys Kellogg, was never married to James Kellogg, with whom she lived as husband and wife in Louisville, Kentucky, Peoria, Illinois, and Evansville, Indiana.

Within a month after the marriage of appellant, his wife left him at Covington, Kentucky, and returned to Louisville, which is the present residence of appellant and his mother, and where the latter two lived prior to his marriage. While in Louisville at that time she worked as a prostitute for three or four weeks in the summer of 1945, in a house of that kind conducted by Mr. Ollie Bessinger, who testified that appellant came there and saw her on several occasions. Appellant's wife testified that she had practiced prostitution in houses of that character in Louisville, for Bessinger, and in New Albany, Indiana. However, she denied that she had engaged in that work in Peoria, although she admitted she had met Ethel Lamar who conducted a house of prostitution in Peoria, and on several occasions had gone there to visit her friends, Gladys Egan, alias Mrs. James Kellogg, and Sue Kearns, alias Mrs. Huntley, who were working there as prostitutes.

The evidence further discloses that Gladys Egan worked at Bessinger's house in Louisville from November, 1945, to April, 1946. Appellant knew her during this time, although the record does not show whether or not he ever saw her at Bessinger's house.

James Kellogg and Gladys Egan registered at the Julian Hotel in Peoria, Illinois, as husband and wife on June 20, and remained there until July 2, 1946, when they checked out. Appellant and his wife registered at the same hotel on June 22, and checked out on July 5, 1946.

After appellant's wife left Bessinger's house in Louisville, she and her husband returned to Covington. However, in the latter part of 1945, or in January, 1946, they returned to Louisville and lived with his mother. In the latter part of the following May she went, by herself, to Peoria, Illinois, where she lived at the Lee Hotel. Appellant joined her in Peoria and they registered at the Julian Hotel on June 22, as above stated. These four parties were friends and associates and rode about the city in appellant's car.

Sue Kearns also worked at Ethel Lamar's place in Peoria with Gladys Egan, and stayed at the Julian Hotel with Frank Huntley. The record is silent as to where appellant and his wife and James Kellogg and Gladys Egan were living between the time they checked out of the Julian Hotel, as above stated, and July 18, except that there is some evidence that they may have lived at the Lee Hotel and other hotels there. At least Sue Kearns and Gladys Egan were working as prostitutes at the Lamar house, and at 11:55 p. m. on July 17, 1946, Gladys Egan, alias Montgomery, was arrested at 317 Prairie Street, Peoria, on the charge of keeping a disorderly house, and at the same time and place appellant's wife, alias Carmen Martin, was arrested at the same place for being an inmate of a disorderly house.

Sue Kearns testified she was a prostitute, then in custody as a material witness in this case, by virtue of being arrested, on August 23, 1946, as an inmate of Mrs. Riddle's house of prostitution in Evansville. She had come from Peoria where she worked for two or three months as a prostitute in the house of Ethel Lamar. She answered as follows to the following questions:

"Q. Well, now Sue, while you worked at Ethel Lamar's house, in Peoria, Illinois, were there other girls working there? A. Yes, sir.

"Q. Would you tell us the names of some of those girls or identify some? A. Well, Glessie worked there.

"Q. Gladys Egan Kellogg? A. Yes, and I saw Fleenor there, Geraldine.

"Q. Geraldine Fleenor? A. Yes, sir.

"Q. And when you say you saw her there, just what do you mean by that? A. Well, when I went to work she would be there. I saw her there several times when I went to work.

"Q. Did you girls work on shifts there? A. Yes, sir.

"Q. Was she working at a different shift from what you were working?

"Defense Counsel: Let the witness testify.

"The Court: Go ahead.

"Q. Is that what you mean, when you would get there she would be there? A. I saw her there several times and she was talking to Ethel and I guess that is what she was doing there."

This witness also went under the name of Mrs. Frank Huntley, but she was never married to Huntley. They lived at the Julian Hotel as man and wife and knew and were friends of appellant and his wife and the other parties to whom we have referred as living there.

On July 18, 1946, the next day after the arrest of Gladys Egan and Mrs. Fleenor at Peoria, appellant and his wife checked in at the Julian Hotel early in the morning. Kellogg and Gladys Egan were also there. The cases against the two women were disposed of by the court at Peoria in the morning of July 18. Shortly after the noon meal appellant and his wife checked out, and left their key. His automobile was in front of the hotel. His wife said she had received a telephone call from Frank Huntley, the consort of Sue Kearns, to come to Evansville. Mr. Julian, the owner or manager of that hotel, said he saw appellant

and his wife, accompanied by Kellogg and Gladys Egan, early in the afternoon of July 18, 1946, go out of the hotel and walk over to appellant's automobile. He could not say that he saw them get in the car, but he presumed they did, for when in only a short time he looked again, the car and the four parties were gone. They had no baggage with them when they left the Julian Hotel on July 18. The record does not disclose where these parties stayed that night. However, this car was parked in front of the Lincoln Hotel at Evansville, Indiana, shortly after 1 o'clock in the morning of July 20, 1946. The bell-hop at that hotel met these four parties, with their baggage, at the front door near the automobile, and conducted them and carried their baggage to the clerk's desk where they registered as Mr. and Mrs. James Kellogg and Mr. and Mrs. R. H. Fleenor, and were assigned respectively to rooms 312 and 308. The bell-hop could not say whether, when he first went to the sidewalk, all of the parties were out of the car, but he said some were. He got some of their baggage from near the front door of the hotel, and other pieces from the car. Both he and the night clerk identified appellant, Mrs. Fleenor, and Gladys Egan at the trial. James Kellogg was not called as a witness.

The evidence controverting that of Mr. Julian, the manager of the Julian Hotel at Peoria, and the night clerk and the bell-hop at the Lincoln Hotel at Evansville, was given by Geraldine Fleenor and Gladys Egan. Mrs. Fleenor said her husband was unable to do manual labor by reason of a tubercular bone; she did not know for whom he worked but he booked horses and placed bets at race tracks. She identified a photograph of her husband's car. This car was also identified by the bell-hop at the Lincoln Hotel as the one that he saw on the early morning of July 20, 1946, just outside the front door of that hotel when he conducted appellant, his wife, James Kellogg and Gladys Egan, and carried their baggage to the desk where they registered. These are the same persons who Mr. Julian testified left his hotel in Peoria, Illinois, on the afternoon of July 18, 1946, and went to this same car in front of his hotel, and

in a very short time the car and the four parties were gone.

Mrs. Fleenor also testified that appellant left Peoria a week before she did, although she said she could not tell the day she came to Evansville. However, she said she came by bus, had to lay over and change busses twice, and arrived at Evansville a little before midnight, and waited at the bus station for her husband to come after her. She first said he came to Evansville in his automobile and arrived there after she arrived. She then said that he arrived at Evansville an hour or two before she arrived on the same night, a little before 1 o'clock.

Gladys Egan testified that she met appellant through mutual friends several years before, and before she was connected or acquainted with Mrs. Fleenor. She made one trip only from Peoria to Evansville, and that was by bus. She came alone and was met by Kellogg at the bus station at Evansville and they walked to the Lincoln Hotel, carrying her luggage, and registered there that night. She did not remember the date. This occurred directly after she and Mrs. Fleenor were arrested in Peoria on July 17, 1946. She did not see Mr. and Mrs. Fleenor at the time she arrived in Evansville and she could not recall that she and Kellogg and Mr. and Mrs. Fleenor left the Julian Hotel at Peoria together on July 18, 1946. The first time she saw the Fleenors after their arrival in Evansville on July 20, 1946, was in the lobby of the Lincoln Hotel two days thereafter.

A remarkable fact about this trip is that the evidence discloses that the destination of each of these parties was Evansville; that they left the hotel at Peoria together at precisely the same time and went to appellant's automobile, and that they arrived at the Lincoln Hotel in Evansville at precisely the same time. It is not impossible, but quite improbable, that these women went to Evansville from Peoria by different bus routes, and they may have landed at different stations. The evidence does not reveal this information, and neither woman speaks of having seen the other on the trip, but the truly remarkable thing is that

they all appeared at the Lincoln Hotel in Evansville at precisely the same time standing near appellant's automobile, which was in Peoria in front of the Julian Hotel in the afternoon when last seen by Mr. Julian when they left the Julian Hotel.

From all these circumstances the jury would well be warranted in not believing the testimony of these women that they went to Evansville from Peoria by bus, and in believing that the four parties made the trip together in appellant's automobile..

From some time in April until August 23, 1946, Mildred Riddle was operating a house of prostitution, and they there sought ana. She testified that during the afternoon of July 19 or 20 of that year, Geraldine Fleenor, with Gladys Egan, came to her house of prostitution, and they there sought work as prostitutes. Mrs. Riddle did not have room for both. She therefore employed Mrs. Fleenor as a prostitute, and walked with Gladys Egan a short distance down the street in the same district to the house of Marie Lawrence, where she left her. Mrs. Fleenor worked as a prostitute at Mrs. Riddle's continuously until August 23, 1946, on a shift from 11:30 a. m. until about 6 p. m., and during· that time she lived at the Lincoln Hotel in Evansville. While she was thus employed at Mrs. Riddle's house, and during her work hours, appellant came to the house· of Mrs. Riddle and borrowed an automobile tire from Mrs. Riddle's husband. It was near evening mealtime and Mrs. Riddle invited him to eat supper with them, although she had never met him before. He accepted the invitation and there ate supper with his wife and Sue Kearns and Mr. and Mrs. Riddle. He then left, leaving his wife there.

Sue Kearns, alias Mrs. Frank Huntley, although she never married Huntley, was a prostitute at Ethel Lamar's house in Peoria, and left that city before appellant and his wife and James Kellogg and Gladys Egan left. She came to Evansville and worked as a prostitute in the house of Mildred Riddle. From there she went to Henderson, Kentucky, where she worked as a prostitute at the Kingdon Hotel about one week before the following transaction occurred.

Shortly before August 23, 1946, appellant and his wife, Frank Huntley, and a Mr. Hollowell, came to Henderson, Kentucky, in the afternoon, in appellant's car which Huntley was driving. They picked up Sue Kearns at the Kingdon Hotel, where she was registered and living with a man friend as Mr. and Mrs. Phillips, and they all, except Mr. Phillips, returned together to Evansville in appellant's car. Sue Kearns within two days was again working as a prostitute in the house of Mildred Riddle, and on August 23, 1946, Mrs. Riddle, Sue Kearns and appellant's wife were arrested at the Riddle house in Evansville, Indiana.

In explanation of this trip, the testimony of appellant's wife discloses that on the day it occurred, Mr. Hollowell, James Kellogg, the appellant and his wife were sitting in the Blue Bar of the Lincoln Hotel at Evansville, when Frank Huntley came in and asked appellant to take him some place. The latter replied that he was sick, and Huntley said, "I will drive myself." Thereupon they all went in appellant's car to Henderson, Kentucky, and brought Sue Kearns from the Kingdon Hotel at Henderson, to Evansville, Indiana. Frank Huntley did the driving. He stopped the car in front of the Kingdon Hotel and went alone to the room of Sue Kearns and brought her to the car.

Appellant relies strongly on Mortensen v. United States, 322 U.S. 369, 370, 64 S.Ct. 1037, 1041, 88 L.Ed. 1331. There Mortensen and wife operated a house of prostitution at Grand Island, Nebraska. They took two of their women prostitute employees on a pleasure trip with them, by automobile, to Salt Lake City, Utah, thence to Yellowstone National Park. It was purely a vacation trip, with the two girls paying their own living expenses, and petitioners bearing the expense of transportation. No acts of prostitution or other immorality occurred during the two week trip, and at the end of that time they all returned with defendants in their automobile to Grand Island, Nebraska, and the girls resumed their activities as prostitutes in defendants' employ. Those defendants were charged in two counts with violating section 2 of the Mann Act in that they transported the two girls in interstate commerce from Salt Lake City, Utah, back to the defendants' house in Grand Island, Nebraska. The District

Court adjudged them guilty, and the Circuit Court of Appeals affirmed. The Supreme Court reversed, and as we interpret the opinion, based its ruling on the following: "The fact that the two girls actually resumed their immoral practices after their return to Grand Island does not, standing alone, operate to inject a retroactive illegal purpose into the return trip to Grand Island. Nor does it justify an arbitrary splitting of the round trip into two parts so as to permit an inference that the purpose of the drive to Salt Lake City was innocent while the purpose of the homeward journey to Grand Island was criminal. The return journey under the circumstances of this case cannot be considered apart from its integral relation with the innocent round trip as a whole. There is no evidence of any change in the purpose of the trip during its course. If innocent when it began it remained so until it ended. Guilt or innocence does not turn merely on the direction of travel during part of a trip not undertaken for immoral ends. If the return journey was illegal, so was the outgoing one since all intended, from the beginning, to end the journey where it began, at Grand Island."

In the instant case no vacation trip is involved. Appellant's wife, within a few months after their marriage, was engaged in prostitution at Louisville, Kentucky, and New Albany, Indiana. He visited her on several occasions at Bessinger's house of ill fame although she lived outside Bessinger's house. She told him she had been engaged as a prostitute at Bessinger's. From there she went to Peoria, Illinois, alone, and defendant followed her there within a week, without any visible means of support. They lived at the Julian Hotel where other prostitutes then lived who were then working at Ethel Lamar's house. She denied having engaged in prostitution in Peoria, yet she admitted visiting frequently the other prostitutes at that house while they were on duty, and associating with them when off duty, and she and one of the others were arrested on July 17, and almost immediately upon their release they left Peoria.

The evidence in this case, supported by the testimony of Sue Kearns, is quite substantial to warrant the jury in believing that appellant's wife was practicing prostitution in Peoria, Illinois, and that he brought her to Evansville, Indiana, for the purpose of there having her engage in her same nefarious work. She was a confirmed prostitute and he knew it. She was continually associating with prostitutes and he knew it, and it was a natural consequence of his taking her to Evansville, that she would again seek work in a house of prostitution, which she did in less than forty-eight hours after their arrival. He was bound to know the natural consequences of his acts. We think the first count is supported by substantial evidence.

Little further need be said about the second count. Sue Kearns knew the appellant and his wife and James Kellogg and Gladys Egan at Peoria, when these three women were working as prostitutes in the house of Ethel Lamar, and all of them eventually came to Evansville and worked as prostitutes in the house of Mildred Riddle. Sue Kearns also knew Frank Huntley at Peoria, for he first brought her to Peoria from Chicago. While working at the Riddle house, Sue Kearns decided to go to Henderson, Kentucky, to work as a prostitute at the Kingdon Hotel for a week. Huntley knew she was there, for he was the one who asked appellant to drive him down to Henderson, Kentucky, to get her and bring her back. Appellant not only loaned Huntley his automobile for that purpose, but accompanied him, and they brought her back to Evansville, Indiana, and within two days she was again working as a prostitute, with appellant's wife, at the house of Mildred Riddle, where appellant borrowed the automobile tire above referred to, and where on the same evening she, with appellant and his wife, had been entertained at dinner.

From the facts disclosed and admitted, Sue Kearns was a confirmed prostitute, and all of these parties knew it. The natural consequense of her return to Evansville was that she would again seek employment in a house of prostitution. This she did, and appellant was bound to know the natural consequences of his acts when he aided in bringing her from Henderson, Kentucky,

to Evansville. The evidence supporting the second account is quite substantial.

Judgment affirmed.

MAJOR, Circuit Judge (dissenting).

It is evident that this is a case where the defendant's moral delinquencies make it difficult to accord him a fair hearing. Without attempting to minimize such delinquencies, it is pertinent to note there is not a word of proof that he ever enticed, persuaded or induced any woman to commit an immoral act, or that he was ever interested in or seen in a house of prostitution either at Peoria or Evansville or that he ever visited such place (with the exception of the Riddle house in Evansville hereinafter referred to), or that he ever profited directly or indirectly from the immoral activities of any woman, including those he is charged with having transported. There is no proof that he had knowledge that any of the numerous women referred to in this case were engaged in prostitution either in Peoria or in Evansville. True, the defendant on a former occasion found his wife in a house in Louisville, Kentucky. Upon her promise to forsake the kind of life in which she was engaged, a reconciliation was effected and again they lived together, with some intermittent separations which followed quarrels concerning matters not disclosed by the record. Shortly before the Peoria episode he had undergone a serious operation and was not an able-bodied man. His chief derelictions were his indifference to the character of his associates and his fondness for the race tracks.

### The First Count.

The first count of the indictment, so far as here material, charges that the defendant knowingly transported from Peoria in the State of Illinois to Evansville in the State of Indiana two women, Geraldine Fleenor (his wife) and Gladys Egan, alias Gladys Kellogg, for the purpose of prostitution. The government relies solely upon circumstantial evidence to prove this transportation. The court instructed the jury that the transportation charged might be proven by circumstantial evidence and, as the majority opinion discloses, the judgment is now to be affirmed upon such proof.

The circumstances relied upon are just two, and as stated in the government's brief are that (1) "Fleenor and his wife, Geraldine, * * * left [Peoria] just after noon [July 18] with James Kellogg and Gladys Egan in Fleenor's car," and (2) "The four, Rudell Fleenor, Geraldine Fleenor, James Kellogg, and Gladys Egan, arrived and registered together at the Lincoln Hotel at Evansville, Indiana, just after midnight of July 19, 1946, after having arrived in Rudell Fleenor's car." Thus stating the situation most favorable to the government, the fact that the women transportees left Peoria with the defendant and some 36 hours later arrived with him in Evansville, Indiana (the map shows a distance of about 250 miles), it is presumed that the defendant transported these two women across the state line. The essential elements of the offense are (1) transportation and (2) for a purpose prescribed by the Act, in this case prostitution. So we have a situation where the transportation has been presumed and where the further presumption has been made that it was for a purpose stated in the Act. In my judgment, this is not permissible and for this reason alone the judgment as to the first count should be reversed.

In the beginning it is well to point out the universal rule followed in the federal courts that an inference or presumption cannot be imposed upon another inference or presumption. In United States v. Ross, 92 U.S. 281, 284, 23 L.Ed. 707, the court stated the rule thus: "Whenever circumstantial evidence is relied upon to prove a fact, the circumstances must be proved, and not themselves presumed. * * * A presumption which the jury is to make is not a circumstance in proof; and it is not, therefore, a legitimate foundation for a presumption. There is no open and visible connection between the fact out of which the first presumption arises and the fact sought to be established by the dependent presumption."

In the recent case of Tot v. United States, 319 U.S. 463, 466, 63 S.Ct. 1241, 1244, 87 L.Ed. 1519, the court stated: "Although the Government may be unable to produce testimony of eye witnesses to the conduct

on which guilt depends, this does not mean that it cannot produce proof sufficient to support a verdict. The jury is permitted to infer from one fact the existence of another essential to guilt, if reason and experience support the inference. In many circumstances courts hold that proof of the first fact furnishes a basis for inference of the existence of the second."

In support of the last statement, the court in a footnote cites Wilson v. United States, 162 U.S. 613, 619, 16 S.Ct. 895, 40 L.Ed. 1090. There the court enumerates numerous cases where an essential element may be established by inference. Among the illustrations cited is that the recent possession of stolen property may create an inference of knowledge, and that in a prosecution for arson, possession of property in the house at the time it was burned raises a presumption that the defendant was present and connected with the offense. I suppose, however, that nobody would contend that the possession of the stolen property in the one instance or the fact that the house was burned in the other could be proven in any manner except by direct proof. In Rosenberg v. United States, 10 Cir., 120 F.2d 935, 937, the rule is stated thus: "But an inference of fact which is essential to the establishment of the offense cannot be rested upon another inference. Conviction cannot be predicated upon one inference pyramided upon another. Presumption cannot be superimposed upon presumption and thus reach the ultimate conclusion of guilt." The same rule is applied in Whealton v. United States, 3 Cir., 113 F.2d 710, 713; United States v. Russo, 3 Cir., 123 F.2d 420, 422; Brady v. United States, 10 Cir., 24 F.2d 399, 404; Nations v. United States, 8 Cir., 52 F.2d 97, 105.

After an examination of what I think are all of the recorded opinions predicated upon the Mann Act, I am unable to find a single case where the transportation element of the offense has been proven by circumstantial evidence. In every case where the transportation was in issue there has been direct proof as to this element, and in all the cases except two the direct proof has been furnished by the woman charged to have been transported. The two cases referred to are Cohen v. United States, 5 Cir., 120 F.2d 139, and United States v. Pape, 2 Cir., 144 F.2d 778. In the Cohen case defendant was charged with transporting his wife, who refused to testify against her husband. The court, without pointing out the character of evidence relied upon to prove transportation, held that it was sufficient. In the Pape case the alleged transportee was not a witness but the court sustained the judgment on proof that the defendant after his arrest had confessed to the transportation. The cases are numerous, of course, which hold that the purpose of the transportation may be inferred or presumed from the circumstances in proof but that is as far as they go. In United States v. Reginelli, 3 Cir., 133 F.2d 595, the court makes the distinction which should be made here. In that case it was contended that a conviction predicated upon circumstantial proof could not stand. The court, after pointing out that the purpose of the transportation could be inferred from the circumstances, stated, 133 F.2d at page 598: "It should be noted that it was only the defendant's purpose in bringing about the women's transportation that needed to be inferred. As already appears, the facts as to the interstate transportation and the immoral practices were directly proven by the oral testimony of witnesses."

Not only was the jury permitted to infer that the transportation alleged in this count took place but they were permitted to do so in face of the direct and positive testimony of both of the women alleged to have been transported that they each made the trip from Peoria to Evansville by bus and that they were not transported by the defendant. These two witnesses were placed upon the stand by the government and there is nothing to indicate that the government was surprised by their testimony. Neither is there anything in the record which contradicts or impeaches their testimony on this vital issue. It is said, however, that the jury had a right to disbelieve them, but even so, the jury was not entitled to infer or presume that the transportation took place. Furthermore, their testimony was corroborated by that of Anna May Fleenor, the mother of the defendant (a defense witness), who testified that she returned from South Dakota where she had been on a

business trip, on Monday July 15, 1946, and that defendant at that time was at her home in Louisville, Kentucky, and that he remained there until the latter part of that week.

Assuming arguendo what I think is not the law, that the transportation may be inferred from the circumstances, it is only the beginning of a series of inferences; innuendoes, suspicions and speculations which must be made if the judgment is to be affirmed. I shall now point out the flimsy nature of the evidence relied upon to prove the two circumstances from which it is inferred that the transportation took place.

The first and highly essential circumstance is that the defendant, accompanied by the two transportees and Kellogg, left the Julian Hotel in Peoria and drove away in defendant's car. If this important link in the chain of circumstances relied upon by the government has not been established, it is obvious that the inference as to transportation which the government deduces therefrom must be rejected. Proof of this circumstance is predicated entirely upon the testimony of James Julian, the owner of the hotel. His testimony certainly does not prove directly the circumstances relied upon, and I doubt if it does so inferentially. He produced in court his hotel register which showed that the defendant and his wife, as well as Kellogg and his wife (the latter were not married but lived together as man and wife and held themselves out to their friends as such), were registered at the hotel on different occasions and were frequently about the hotel. The witness knew them all personally and identified them in the courtroom. His testimony in question and answer form, so far as material, to the instant question, is as follows:

"Q. Did they [Fleenor and his wife] come back after that, Mr. Julian? A. Yes, they were back several times—he was. They came back around the 18th, July 17 or 18. Well, they checked out the 18th. That is the day.

\* \* \* \* \* \*

"The Court: What time did they check out?

"The Witness: Shortly after dinner, in the afternoon.

\* \* \* \* \* \*

"Q. Mr. Julian, you said that the Fleenors checked out of your hotel about, as I understood you to say, shortly after noon, early afternoon of the 18th of July, 1946? A. Yes, sir. That is what the record shows.

"Q. Do you recall their leaving at that time? A. I recall—well, they come and go. They were there so long, they would come and go, so the books show they left on that day, why they left on that day.

"Q. Do you remember seeing them leave? A. I remember seeing them coming in and going out, but I remember the room was vacant that day and it was drawed to my attention, and that is when they left.

\* \* \* \* \* \*

"Q. \* \* \* Who, if anyone left the hotel with the Fleenors on that 18th day of July, 1946? A. Well, to my knowledge, now, not be definite on that particular date, but Mr. and Mrs. Kellogg was there with them and went out.

"Q. How did they leave the hotel? A. Well, they had a car.

\* \* \* \* \* \*

"Q. You saw them leave in the car? A. Well, I saw them go to the car and when I looked up after bit, the car was gone. I did not see no more of them.

\* \* \* \* \* \*

"Q. What is the fact as to whether or not those four people, Mr. and Mrs. Kellogg and Mr. and Mrs. Fleenor left in that car? A. To my knowledge, when they went to it, they left in that car, but I did not see them all get into it. They disappeared from the walk, the car was gone.

\* \* \* \* \* \*

"Q. Didn't you testify yesterday, Mr. Julian, that the four of these people were there together and all got into the car? A. I could not say personally. I did not stand there and watch them get in that car. Now, I looked at them go to the car, and to my knowledge, I figured that is where they all went.

"Q. Off in that car? A. I figured that way, but I am not sure.

\* \* \* \* \* \*

"Q. Did either Mr. Kellogg or Mr. Fleenor operate and have a car while they were staying at your hotel that period? A.

There was one car there, one, I presumed it belonged to Mr. Fleenor."

The witness was unable to identify a photograph of Fleenor's car which at that point was offered in evidence. It is evident that this witness was merely testifying from his record that a Mr. and Mrs. Fleenor were registered and checked out on July 18, and that he had no personal recollection as to whether the defendant was there on that particular day. If there be any doubt on this score it is removed by his cross-examination which, so far as material, shows:

"Q. You were sure you were not there on the 18th? A. I was not there on the 18th because I remember the night clerk saying in the morning they had come back.

"Q. Then, of your own personal knowledge, you don't know whether it was this man that signed on the 17th or 18th? A. He did not sign it in my presence.

\* \* \* \* \* \*

"Q. You are telling this Court and this Jury today that you don't know whether this man registered in your hotel on the 17th or 18th? A. No, he did not register in any time there. He registered when I was on duty, not at that time."

He further testified on cross-examination:

"Q. You don't recall their leaving on the 17th or 18th, do you, Mr. Julian? A. Well, on the 17th or 18th there—yes, some way or other I recollect that she was— I talked to her or something.

"Q. You talked to her? A. Yes, sir.

"Q. Could it have been another man besides this, that left with her on the 17th or 18th? A. Well, now, that day I saw Mr. Kellogg and her, and I could not just say, I would not swear.

"Q. You are not now positive you saw Mr. Fleenor in Peoria the 17th or 18th of July this year? A. On the book, he was there."

This testimony speaks for itself. Certainly it falls far short of proving that the defendant was in Peoria on July 18 or that he left in his or anybody else's car. It doesn't even create a respectable inference that he did so. Nor is there any direct proof that this party arrived in Evansville, Indiana, after midnight of July 19, 1946 in the defendant's car. It is shown that the two couples arrived at the hotel at about the same time and that Fleenor's car was parked in front of the hotel. The night clerk testified as to the registration and stated she did not remember whether Mr. and Mrs. Fleenor or Mr. and Mrs. Kellogg checked in first. The bell hop at the hotel testified that he first saw these two couples at the entrance of the hotel, that a car was parked in front of the hotel (identified as defendant's car), that he got some baggage from the car and some from near the hotel door, that some of the people were out of of the car but how many were in and how many were out he did not know and he was unable to say which ones were in the car and which ones were out. On cross-examination this witness testified as follows:

"Q. On this occasion will you say that you got some baggage at the door, in other words, there were guests coming in with baggage, is that true? A. That is right.

"Q. You got the baggage and went to the desk and set it down? A. That is right.

"Q. Didn't you say the next thing you went back for a call and got some other baggage, is that what you are telling? A. Yes, sir.

"Q. You didn't know whose bag? A. Oh, no."

Thus there is no direct proof, as the government asserts, that these four people arrived at the Evansville hotel in defendant's car; at the most it can only be inferred that they did so. Indulging in such inference, we then have a situation where it can only be inferred from the testimony heretofore related that these four people checked out of the hotel in Peoria on the afternoon of July 18 and left in defendant's car and can only be inferred that after midnight of July 19 (some 36 hours later) they arrived at the hotel in Evansville in defendants' car; and, having inferred these two circumstances, we must indulge in the further inference that by reason thereof the defendant transported the two women in interstate commerce from Peoria to Evansville, and then after this pyramid of infer-

ences indulge in further inference that the transportation was for the purpose of prostitution.

Furthermore, even though the transportation took place as alleged, it is difficult to discern a reasonable basis for an inference that it was defendant's purpose to transport his wife and Mrs. Kellogg for any purpose proscribed by the Act. But it is asserted that they both practiced prostitution after their arrival in Evansville. That is true as to defendant's wife—in fact, she admits it—but there is not a word of direct proof that Mrs. Kellogg did so and she emphatically denies that she did. The only testimony which bears on the assertion as to Mrs. Kellogg is that of Mildred Riddle, the keeper of a house in Evansville. She testified she was personally acquainted with defendant's wife (Geraldine Fleenor) and that she saw Gladys Kellogg one time. She testified as follows:

"Q. When and where did you first see those two women? A. They came to my house."

She then fixed the date as the 19th or 20th of July, 1946.

"Q. For what purpose did they come? A. Well, they wanted to work.

"Q. What kind of work? A. There at the house.

"Q. You mean as prostitutes at the house? A. Yes.

"Q. They wanted to be prostitutes at your house? A. Yes, sir.

"Q. Both of them? A. No.

"Q. I mean, did both ask for it? A. Well, I guess that is what both came for, but I just talked to Geraldine."

She then testified that she took Mrs. Kellogg to a Mrs. Lawrence who had been renting rooms and that she never saw Mrs. Kellogg after that time. The most that can be said is that Mrs. Kellogg was along with Mrs. Fleenor when the latter was looking for work. Mrs. Kellogg denies that she was with Mrs. Fleenor on the occasion referred to but admits that after her alleged husband checked out of the hotel, she had a room for a few days at the home of Mrs. Lawrence. Even if it be inferred from this incident that Mrs. Kellogg prac-

ticed prostitution in Evansville, there is no proof from which it can be reasonably inferred that defendant had knowledge thereof. The defendant's wife had hours at the Riddle house from about 11:30 in the morning to 6 in the evening; however, she was not there every day—sometimes it would be three or four days between trips. It is significant that the time she spent at the Riddle house was during the time the defendant was away from the hotel where they were living, attending the races in Louisville. Rather than infer as the government does that the defendant had knowledge of his wife's activities at the Riddle house, it seems more reasonable to infer that his wife was purposely keeping from him knowledge of her activities.

An incident made much of is Mildred Riddle's testimony that she saw the defendant one time at her house when he came there to inquire of her husband about an automobile tire. The witness invited him in for supper.

"Q. Who was present at that time? A. Well, Geraldine and I think Sue [transportee in second count] was there and myself and my husband." There is no evidence that defendant at any time was in or around a house of prostitution in Peoria, and this is the sole instance where he was in such a house in Evansville. This incident, however, is strongly relied upon to show the defendant's knowledge that his wife was engaged in prostitution. The evidence, however, shows nothing more than that the parties had dinner together. Just whether a man by eating dinner with women can determine whether or not they are engaged in prostitution, I would not know, but the inference which is sought to be drawn from this incident is no more unreasonable than many of the other inferences which have been indulged in.

Mrs. Kellogg testified that her purpose in coming to Evansville was to attend the races. The defendant's wife testified that she came there at the request of Francis Huntley, the alleged husband of Sue Kearns. If it be inferred that the purpose of these women in coming to Evansville was to engage in prostitution, on what rational basis can it be inferred that it was also the defendant's purpose? The proof, in my judg-

ment, furnishes no basis for such an inference, notwithstanding the defendant's indifference to ordinary moral standards.

## The Second Count.

The second count, so far as here material, charges that the defendant knowingly transported, caused to be transported and aided and assisted in such transportation from Henderson in the State of Kentucky to Evansville in the State of Indiana a woman by the name of Sue Kearns for the purpose of prostitution. Sue Kearns, though never married, lived with Francis Huntley as his common-law wife, both in Peoria and in Evansville. In both cities she was an inmate of a house of prostitution and in Evansville in the same house with Mrs. Fleenor. While the record does not show, we may take notice of the fact that Henderson, Kentucky, is only a few miles and just across the river from Evansville, Indiana. Some time prior to the 16th of August Sue Kearns and her consort, Francis Huntley, had a falling out and Sue took up her abode in the Kingdon Hotel in Henderson. On or about the date alleged Huntley, driving the defendant's car and accompanied by the defendant, his wife and one Hollowell, went over to Henderson, and Sue was returned in the automobile to Evansville where she shortly returned to the Riddle house. This is the transportation alleged in the second count.

In this instance the transportation was proven by direct evidence but the doubtful question is whether that transportation was by the defendant and, if so, whether it was for the purpose proscribed by the Act. The sole testimony concerning the conception of this trip was that given by the defendant's wife. In response to a question she stated: "Rudell and myself and Mr. Hollowell, and I believe Mr. Kellogg was sitting in the Blue Bar. The Blue Bar is beneath the Lincoln Hotel. That is the bar that belongs to the hotel, and Frank came down and asked Rudell to take him some place and he said, 'I am sick.' He said, 'I will drive myself.' I said, 'Come on, I want to get something to eat anyway.' So we drove along and didn't pay any attention and Frank went over and went into a hotel and brought Sue and brought her out, she came out and got in the car and we came back over and went to a restaurant or cafeteria around the corner from the hotel and got something to eat, and Rudell and I went to the movies."

There isn't a word of proof that the defendant had any knowledge as to where Sue Kearns was located at that time; in fact, there is no proof that he was told or knew that Huntley proposed to take a trip which would culminate in the transportation of his alleged wife. It is evident that the defendant was reluctant to make the trip because of his physical condition but that he was willing for Huntley to drive his car, and that he and his wife went along merely for the ride. When the party arrived at the hotel in Henderson, according to the testimony of Mrs. Fleenor, all of them remained in the car except Huntley and he went to the hotel to inquire about Sue. What happened at that point is told by Sue in her testimony.

"Q. All right now, how did you get back from Henderson, Kentucky, to Evansville, Indiana? A. Mr. and Mrs. Fleenor and Mr. Hollowell and Frank came over.

"Q. Now, that is the defendant Fleenor and Geraldine Fleenor—that is whom you are talking about? A. Yes, sir.

"Q. And Frank is Frank Huntley? A. Yes, sir.

\* \* \* \* \* \*

"Q. Do you know whose car? A. In Mr. Fleenor's car, Mr. Huntley was driving.

\* \* \* \* \* \*

"Q. When was it, day or night, they came over? A. It was in the afternoon.

"Q. Where did they find you? A. At the Kingdon Hotel.

"Q. Did all or one of them, or more than one of the four people that you mentioned, come up? A. Just one.

"Q. Who came? A. Mr. Huntley.

\* \* \* \* \* \*

"Q. What happened then, will you tell us? A. He asked me to come back with him. Well, we had planned to go to my mother's, so he told me to come on back and we would leave and go home to North Carolina.

"Q. Did you go? A. No, sir.

"Q. Why didn't you go, Sue? A. We came back to Evansville and—well, it was my suggestion that I stay on here for a while longer."

After the party returned to Evansville, Huntley and Sue again registered at the Lincoln Hotel as husband and wife, and shortly afterward she returned to the Riddle house. Her cross-examination discloses:

"Q. Did Fleenor have anything to do with your coming to Evansville? A. No, sir.

"Q. You were with your husband, the boy who holds himself out as your husband, Frank Huntley? A. Yes, sir.

"Q. You introduced him to Mr. and Mrs. Fleenor as your husband? A. Yes, sir.

"Q. And registered in the hotel as man and wife? A. Yes, sir.

"Q. Then after you got here you held yourself out as man and wife? A. Yes, sir.

\*   \*   \*   \*   \*   \*

"Q. Now, when you left Evansville and went over to Henderson, did Mr. Fleenor have anything to do with your leaving Evansville? A. No, sir.

"Q. Was it his suggestion? A. No, sir, it was not anyone's.

"Q. You and Frank had had an argument, is that true? A. Yes, sir.

"Q. You picked up and left? A. Yes, sir.

"Q. Had you all made plans—you said something about having made plans to go to your mother's. A. Yes, sir, we had.

"Q. Then you left and went to Henderson? A. Yes, sir.

"Q. Did Mr. Fleenor or Mrs. Fleenor, or Mr. Hollowell, did they come and say anything to you about coming back? Who asked you to come back? A. Frank."

The court then took a hand in the examination of the witness as follows:

"The Court: Who was in the car when you came home from Henderson? A. Mr. and Mrs. Fleenor and Mr. Hollowell and Frank and myself.

"The Court: Was anything said on that trip back, in the presence of this Defendant as to what you were going to do when you got back? A. Yes, I think their understanding was we were going to leave for North Carolina.

"The Court: Did you talk about it in the car? A. Yes, sir, we did talk about it.

"The Court: Talk anything about going back up on First Street? A. No, sir, we did not.

\*   \*   \*   \*   \*   \*

"Q. After you got back over here to Evansville did Mr. Fleenor take you down to Mrs. Riddle's? A. No, sir.

"Q. Where did you leave Mr. and Mrs. Fleenor and Mr. Hollowell? A. We went to a restaurant around the corner from the hotel and we ate and then I left them—I think they went to a movie. I am not sure, but Frank and I went upstairs when we left them in the lobby."

There is no other testimony in the record which proves or tends to prove the charge of the second count. In my judgment, it is not sufficient to show that the defendant transported, caused to be transported, or aided or assisted in the transportation of Sue Kearns on the return trip from Henderson to Evansville. True, it was the defendant's car, but it was put in motion and operated solely by Huntley. It is quite plain that defendant permitted this use by Huntley as a matter of favor or accommodation. The trip was not made at the suggestion of the defendant; in fact, it was conceived solely by Huntley. The most that can be said of the defendant is that he went along for a ride in his own car, and that the hauling of Sue Kearns was only an incident as far as he was concerned. There is no proof that the defendant had knowledge of Huntley's purpose in making the trip until they arrived at the Kingdon Hotel in Henderson or that the defendant by any act, word or deed invited, persuaded or induced Sue Kearns to get into the car and make the return trip with them to Evansville. That transportation, in my judgment, was solely the act of Huntley and not that of the defendant.

Furthermore, even though the transportation be imputed to the defendant, there is not the slightest basis for a rational inference that it was on his part for any improper purpose. There is no evidence and

no reason to think that he had even a remote interest, directly or indirectly, in the activities of Sue Kearns. How could it possibly have made any difference to him whether Sue Kearns engaged in prostitution upon her return to Evansville? In fact, it was none of his business or concern. She was living with Huntley as his wife and, so far as the record discloses, the defendant had no information or knowledge that they were not married. If there is any room for an inference of an improper motive in this transportation it must be attributed to Huntley and not to the defendant. Motive or purpose is personal and cannot be transmitted from one to another. More than that, the direct proof shows without contradiction that so far as the defendant was aware Huntley induced Sue Kearns to return to Evansville upon the latter's promise that she would be taken to North Carolina for a visit with her mother, and the proof also discloses without contradiction that this was the sole purpose discussed in defendant's presence on the return trip.

The government's case here, in my judgment, is weaker than it was in Mortensen v. United States, 322 U.S. 369, 64 S.Ct. 1037, 88 L.Ed. 1331, which was reversed by the Supreme Court. There, the act of transportation was not in dispute and the court considered only whether the proof sufficiently established the proscribed purpose. The defendants were the keepers of a house of prostitution, took two of their inmates into another state, brought them back and the women immediately resumed their activities in defendants' house. In United States v. Oriolo, 3 Cir., 146 F.2d 152, the Court of Appeals distinguished the Mortensen case and affirmed a conviction under the Mann Act. In my judgment this case was far stronger for the government than either the Mortensen or the instant case. Nevertheless, the Supreme Court allowed certiorari and reversed the judgment without opinion on the strength of the Mortensen case. 324 U.S. 824, 65 S.Ct. 683, 89 L.Ed. 1393.

In my view, the proof is wholly insufficient to support the judgment as to either count. I would reverse it. Entertaining this view, I find it unnecessary to consider the numerous other errors assigned.