**LOFTUS v. UNITED STATES.**
No. 4412.

Circuit Court of Appeals, Seventh Circuit.
Jan. 15, 1931.

Rehearing Denied March 26, 1931.

O. J. C. Wray, of Chicago, Ill. (Frank E. Encell, of Chicago, Ill., of counsel), for appellant.

George E. Q. Johnson, U. S. Atty., and James C. Leaton, Asst. U. S. Atty., both of Chicago, Ill., and Albert Ward, Sp. Asst. to Atty. Gen.

Before ALSCHULER, SPARKS, and PAGE, Circuit Judges.

SPARKS, Circuit Judge.

Appellant, with Albert Hoffman, Barney Levin, Roy Mack, Guy Powell, George D. Cherones, Ted Baldwin, Leo Baldwin, Achilles Balalas, John Balalas, and Frank P. Bullard, was charged by grand jury indictment with having unlawfully, feloniously, and knowingly conspired, confederated, arranged, and agreed with Thomas Shea and other unknown persons, from on or about January 1, 1926, to and including July 1, 1929, to unlawfully transport stolen automobiles in interstate commerce, and to receive, conceal, store, barter, sell, and dispose of such stolen automobiles while thus moving in interstate commerce. This charge is hereinafter referred to as count 1.

Appellant was further charged by separate indictment with having, on or about January 16, 1927, unlawfully, feloniously, and knowingly received, concealed, stored, bartered, sold, and disposed of a Hudson automobile in Chicago while it was moving in and was a part of interstate commerce, and which had theretofore been stolen from one Dodd at Detroit, Mich. This charge is hereinafter referred to as count 2.

Appellant was further charged by indictment with having, on or about June 14, 1927, unlawfully, feloniously, and knowingly received, concealed, stored, bartered, sold, and disposed of another Hudson automobile in Chicago while it was moving in and was a part of interstate commerce, and which had been stolen from Arthur C. McCormick in Detroit, Mich. This charge is hereinafter referred to as count 3.

Arthur Hoffman, Barney Levin, Roy Mack, Guy Powell, and George D. Cherones, separately, were also charged with substantive offenses similar to those with which appellant was charged. On motion of all the defendants thus charged all of these causes were consolidated and tried at the same time.

The two Baldwins and Bullard pleaded guilty; the two Balalases were not found; Levin, Mack, Powell, and Cherones were found not guilty; and appellant and Hoffman were found and adjudged guilty as charged, and from such judgment appellant presents this appeal.

The statute under which count 1 is drawn is as follows: "If two or more persons conspire * * * to commit any offense against the United States, * * * and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined * * *, or imprisoned * * *, or both." Section 88, title 18, USCA.

The offense which is charged to be the object of the conspiracy in count 1, and upon which counts 2 and 3 are based, is the violation of the National Motor Vehicle Theft Act, section 408, title 18, USCA, which provides that whoever shall transport or cause to be transported in interstate commerce a motor vehicle, knowing the same to have been stolen, shall be punished, etc. It further provides that whoever shall receive, conceal, store, barter, sell, or dispose of any motor vehicle moving as, or which is a part of, or which constitutes, interstate commerce, knowing the same to have been stolen, shall be punished, etc.

The evidence in this cause is voluminous, due to the fact that seven causes were consolidated and tried at the same time. It is not necessary to set forth a résumé of all the evidence which tends to prove that a conspiracy existed among certain of the defendants, other than appellant, to do the things as charged in the first count. The evidence shows beyond a reasonable doubt that the defendants Ted Baldwin and Leo Baldwin, and one Thomas Shea, who died before the filing of this count, not only conspired to do the things as charged, but at the time referred to in the count were, and had been, carrying out these plans on a very extensive scale. They were and had been moving stolen cars back and forth from Detroit to Chicago, and from other states to these cities, with great frequency. They had employed Louis Windt of Chicago to make, and he did make, dies and plates for them by means of which they could change the original numbers of the stolen engines and cars, and also the manufacturers' name plates, thus rendering detection very difficult.

Thomas Shea was shot to death at Detroit while riding with the Baldwin brothers in an automobile which had been stolen in Michi-

gan. In his effects were found many keys which fit the locks of different makes of automobiles. Various automobile keys and dies for changing numbers were also found in possession of the Baldwins, and one of them told Windt they were using the dies on "hot" cars. Many forged bills of sale and assignments of title were introduced, most of which were proved to have been executed in whole or in part by Shea or one of the Baldwins.

The evidence shows that in 1927 these three men when in Chicago frequented a place known as the Uptown Fur Company, where they drank and played cards. This was a corporation of which appellant was president and a director from March, 1926, to November, 1927, during which time appellant says he visited the company's place of business every second day or so. The capital stock consisted of fifty shares, of which appellant owned forty-six, Alex Balalas two, and George D. Cherones two. In 1927 Achilles and John Balalas assisted their brother Alex in running the Uptown Fur Company. All three brothers at the time of the trial were in Europe. The evidence further shows that these Balalas brothers were friends and associates of Thomas Shea and Ted and Leo Baldwin. Appellant was one of the original incorporators of the Uptown Fur Company, and three stolen automobiles were traced to him; the defendant Cherones was also an original incorporator, and he received one stolen automobile; defendant Guy Powell was the attorney who incorporated the association, and he received a stolen automobile; and all of these automobiles last above referred to were traced to Ted and Leo Baldwin and Thomas Shea. These facts, with many others shown by the record, fully support the charge of conspiracy as to the Baldwins and Shea. This is evidently the conclusion at which the defendants Bullard and the Baldwins arrived, for each of them pleaded guilty.

The evidence upon which the government relies to connect appellant with this conspiracy is, in substance, as follows: On April 13, 1927, Mr. Mueller, of Detroit, Mich., became the owner of a Cadillac automobile bearing the original motor No. 146178. On August 13, 1927, this automobile was seen in front of the Twenty-Ninth District Police Station, known as Hudson Avenue Station, Chicago, and being the station in which appellant at that time worked. The machine was examined by Officer McDonald, and it was found that it bore the initials "J. W. L." in a light yellow paint on each door. It also

bore a Hudson, Ill., 1927 license plate 264090, and the motor number had been changed to 146787. At this time Officer Cox asked appellant where he had obtained this car, and he replied that he had bought it about two or three months before from a man around Wilson and Broadway, and that he did not know anything about this man; but, upon being asked if it was the same fellow who had sold the cars to the Balalases, appellant replied that he guessed it was.

On August 17, 1927, Officers McDonald and Vaughan interviewed appellant. Vaughan said to appellant: "Lieutenant, you have a Cadillac coupé that bears your license. I understand it is your car. We would like to see that car." Appellant answered: "You can't see the car." "Why?" asked Vaughan. "I sold it yesterday," replied appellant. "You sold it! Tell us the party to whom you sold it. We will see the car," said Vaughan. "The party does not live here in Chicago." "Well," asked Vaughan, "where does he live?" "He lives out of town," answered appellant. "Where out of town? What's his name?" asked Vaughan. Appellant replied, "Dan Carlton. I don't know where he lives, but I will try to get hold of the car for you." "Well," said Vaughan, "Lieutenant, if you don't know now, or didn't know before, now you know it's a stolen car. What we want to do is to get hold of it. We have to trace that down." Appellant said, "I can't do anything for you at this time."

On the following morning appellant was interviewed by Chief Hughes. The chief said, "Lieutenant, where is this car that these officers are looking for?" Appellant replied, "Chief, I will tell you the story about the car. A fellow that I had seen with it around Wilson and Broadway for quite a while was going to Europe and didn't want to put it in storage. He said that he had a Cadillac coupé and another car and that he didn't want to put the Cadillac in storage where it would be railroaded, knocked and smashed. He also stated that he would like to have a nice place to put it and thought that I might be able to help him. I told him that I had a big garage in back of my home and that there was no reason why he couldn't put it there. I also assured him that nobody would bother it. He said that that was very nice and kind of me, and that in order to show me how much he appreciated it I could have the use of the car." Then the Chief asked, "Who is this man?" "A fellow I know as Dan Carlton," replied appellant. The Chief continued, "Where did this Dan Carlton live?" "At the

Chelsea Hotel," answered appellant. "And you had the car?" "Oh! yes, Chief, I had the car three or four months." Cox then asked, "Why were your initials on the car?" "Oh!" replied appellant, "they were put on with only light paint." At this point Officer McDonald spoke, "License plates for a Hudson car were on that car." "That was in case of an accident, so that the car could be identified," said appellant. "Why, I took the plates off that I had on my Hudson car and put them on this Cadillac." Lieutenant Vaughan resumed the questioning with: "Well, now where is the car? The man loaned it to you, and the man went to Europe you say." Appellant said, "Yes." "Where is the car now?" "The man returned and day before yesterday I turned the car over to him," replied appellant. "Did you remove the plates?" "I did." "You still left your initials on the car?" "Yes," answered appellant.

On August 16, 1927, this car was found abandoned on a street in the city of St. Joseph, Mich.; this being the same day on which appellant said he sold it. At the time it was found there were no initials on either door, the places where they had been were varnished, and both doors were locked. They were afterwards unlocked with a Cadillac key. The evidence showed that this car had been stolen, and was the same car which Mr. Mueller of Detroit purchased on April 13, 1927. Witness Cruger testified that he knew Dan Carlton, and that Carlton owned a Lincoln sedan and a Cadillac coupé; that he (Cruger) saw appellant in possession of a Cadillac car similar to the one Carlton had. A photograph of Thomas Shea was submitted to Cruger, and he said it resembled the man he knew as Dan Carlton.

On February 25, 1926, there was stolen from Harry Dodd, at Detroit, Mich., a Hudson automobile bearing motor No. 369873 and serial No. 670046. At the time it was stolen it was worth approximately $1,600. This automobile was sold by appellant to Brennan, a police officer of Chicago, on or about February 27, 1927. Appellant was the superior officer of Brennan, and they both worked out of the same station. Brennan had seen appellant driving this car, and purchased it from him for $430. When it was delivered, both the motor and serial numbers had been changed. Appellant did not give Brennan a bill of sale for the car, but kept putting him off, saying that he (appellant) was busy, and Brennan never received a bill of sale. He did not ask where appellant got the car, nor did

appellant tell him. Appellant claimed that he bought this car of E & P Motor Sales Company, 1452 Michigan avenue, the bill of sale for which, he stated, was in the possession of his attorney; that he applied to the secretary of state of Illinois for a 1927 license for this car; and that he continued to drive the car until about February 1, 1927.

At the trial appellant's counsel denied having the bill of sale; and thereupon the government introduced in evidence a photostatic copy, which was admitted to be a true copy, and which appellant claimed to have been the bill of sale which he received from E & P Motor Sales Company for the car which he sold to Brennan. It bore date of December 27, 1926. In the application for an Illinois license for 1927, which is referred to above and which bears date of January 4, 1927, appellant swore that he purchased this car on March 16, 1926, and that it was brought into Illinois on the same date; and that he had never registered it in Illinois, but had registered it in another state.

The bill of sale for the Brennan car, which is Government's Exhibit 64, in many respects is a duplicate of the bill of sale which is marked Government's Exhibit 39. Expert testimony showed that one of these exhibits was, in part, a carbon copy of the other. Exhibit 39 is a bill of sale for a Hudson automobile which got into the possession of Police Officer George Barnes. It was stolen from Mr. McCormick of Detroit on July 15, 1926, and at that time was worth $1,400. Its motor and serial numbers were changed, and Barnes purchased it on January 15, 1927. Barnes had been acquainted with appellant for four or five years, and they worked out of the same police station. Barnes was a patrolman, and appellant was his superior. Barnes testified as follows: "About the middle of January, 1927, I first talked to Loftus about buying an automobile, in front of the Hudson Avenue Police Station, 1501 Hudson Avenue, Chicago; I was admiring a Hudson brougham machine out in front of the station. I said, 'Gee, that's a keen car,' and he said that he knew a fellow who had one. * * * The next night, or the night after, I don't know just which, a man by the name of Katz came in; a man came in the station and Lieutenant Loftus introduced me to this man Katz in front of the desk at the police station; that was about the middle part of January, two or three days after the first conversation."

Negotiations between Katz and Barnes resulted in Barnes' buying the automobile

from Katz for $875, and receiving the bill of sale, Exhibit 39, which purports to be signed by E & P Motor Sales Co., by E. M. Peters. Barnes had never talked to any one with reference to buying a car except appellant.

Appellant claims to have bought the Hudson car which he sold to Brennan from E & P Motor Sales Company in December, 1926, and that the man who sold it to him gave him a bill of sale, which is Exhibit 64. It purports to be signed by E & P Motor Sales Co., by E. M. Peters.

Eugene M. Peters testified that during the months of November and December, 1926, he was engaged in buying and selling used cars at 1452 South Michigan avenue, Chicago, under the name of E & P Motor Sales Company. He had some blank bills of sale printed for use in connection with his business, and Exhibits 64 and 39 are the forms which he was then using. He did not sign the name E. M. Peters which appears on said exhibits. He was not in Chicago on January 15, 1927, but had gone out of business and was in New Orleans. He did not sell his business to any one, but closed the place, and no one went into business there after he left. He did not sell a car to Officer Barnes, nor to appellant, and he was not acquainted with appellant. He knew Ted Baldwin as Ted Farwell, and Baldwin was in his place of business several times in December, 1926. No one was in business with Peters while he was at that place, and during November and December, 1926, he had no one in his employ except a colored boy who cleaned cars. He did his own buying and selling.

Appellant testified that he bought the Hudson car represented by Exhibit 64 of Joseph Glaser at 1452 South Michigan avenue, that he had bought several cars at this place, and that Glaser had always given him the inside price; but witness Peters testified that Glaser did not work at that place at any time while he (Peters) was running it; but that he knew a Joseph Glaser who was running the Sunset Cabaret at that time on Thirty-Fifth street.

■ There was considerable other evidence introduced by the government bearing on the guilt of the various defendants other than appellant. It is contended by appellant that much of it was not in any way connected with him and was therefore erroneously admitted. If appellant's cause had been tried separately, it is quite likely that some of this class of evidence would not have been admitted; but it must be remembered that all the defendants moved to try all these causes jointly, and the request was granted over the objection of the government. The court properly instructed the jury as to how this evidence should be considered, and appellant is in no position to complain. After a detailed examination of all such evidence we are convinced that it was properly admitted as against one or more of the defendants.

■ As to the three charges upon which he was convicted, appellant insists that the court erred in not sustaining his motion to strike out separately all the evidence in relation thereto, and in not separately directing a verdict in his favor. He bases his contention as to the conspiracy in count 1 upon the following propositions: (1) The evidence does not show that he was a party to the conspiracy. (2) The evidence shows, if anything, a series of distinct and separate conspiracies with which appellant was in no way connected.

The business in which the Baldwins and Shea were engaged was more than a series of distinct and separate conspiracies. The evidence fairly shows that they were engaged in a general conspiracy to steal automobiles and to transport them into other states, where they received, concealed, stored, bartered, sold, or disposed of them. A part of the conspiracy was to sell and dispose of the automobiles to others, and to have others receive them. The conspiracy operated until such automobiles were finally disposed of and lodged in the possession of some person who was not, at any stage, a party to the conspiracy.

It will be readily observed that there were several fields of operation included in the conspiracy, and it is not likely that those engaged therein were all acquainted. For instance, the thieves may not have known the transporters, and neither of them may have known the person who changed the motor and serial numbers. It is altogether probable that the receiver and storer and concealer had no acquaintance whatever with their predecessors in the crime, nor with each other. What might to each of them seem a distinct and separate conspiracy on his part, as applied to one or more cars which he or they may have handled unlawfully, becomes a part of the general conspiracy by reason of the fact that by his or their unlawful act he or they abetted the general conspiracy.

■ With relation to counts 2 and 3, as well as to count 1, appellant contends there was no evidence tending to show that he knew any of the cars with which he was connected were stolen cars. Possession of the fruits of

crime recently after its commission justifies the inference that the possession is guilty possession, and, though only prima facie evidence of guilt, may be of controlling weight unless explained by the circumstances or accounted for in some way consistent with innocence. It is a question for the jury whether the inference of appellant's guilty reception of the automobile was overcome by the explanation. His statements and explanations with relation thereto were so inconsistent and unreasonable that the jury was quite justified in finding that he knew the automobiles had been stolen. Wilson v. United States, 162 U. S. 613, 16 S. Ct. 895, 40 L. Ed. 1090; Wilkerson v. United States (C. C. A.) 41 F.(2d) 654. It is true that appellant denied guilty knowledge as to each stolen automobile referred to in each count of the indictment; but, on appeal, if there is any evidence to support the finding, we cannot disturb it. The Cadillac car which was found in appellant's possession on August 13, 1927, was stolen in Detroit not earlier than April 13, 1927. Appellant said he came into possession of it three or four months previous to August 13. If he had received it four months previously, he must have received it almost immediately after it was stolen, and the presumption of appellant's guilty knowledge would indeed be strong, for the presumption of guilt flowing from possession of recently stolen property grows weaker as the time of possession recedes from the time of the theft. It is not necessary to repeat appellant's interviews and the evidence introduced as to the immediate disposition of this car after the first interview, which are fully set forth above, but it is sufficient to say that such interviews and evidence do not comport with innocent possession.

The Hudson car, referred to in count 2, was stolen in Detroit on February 25, 1926. The history of this car since its theft has been set forth in this opinion. The fact that appellant, in his application for an Illinois license for 1927, made a sworn statement that he had purchased the car on March 16, 1926, and that it was brought into Illinois on the same date, and that he had not previously registered it in Illinois, but had registered it in another state, may be sufficient, in point of time, to raise a presumption that appellant knew the car was stolen property. The further circumstance that this car was worth $1,600 on February 25, 1926, and that appellant sold it to Brennan on February 27, 1927, for $430, greatly strengthens the presumption of guilty knowledge on the part of

appellant which he did not satisfactorily explain to the jury, and he cannot complain of the finding.

On January 15, 1927, Officer Barnes saw a Hudson brougham parked in front of the police station, and expressed to appellant a desire to possess it. Appellant replied that he knew a man who had one, and within a day or two, without Barnes' having mentioned the subject of automobiles to any other person, a stranger to Barnes appeared at the station whom appellant introduced to Barnes as Mr. Katz, from whom Barnes purchased a Hudson automobile worth $1,400 for $875. It was stolen in Detroit on July 15, 1926. The bill of sale for this car, and that for the car referred to in count 2, were forgeries, and the written portion was executed by Ted Baldwin, and in part were carbon copies. These facts, if true, were unquestionably sufficient to send the third count to the jury on the matter of guilty knowledge. Appellant's explanation was a mere denial, and the jury did not believe him, and its determination is final.

■ Many facts and incidents were introduced by the government which tended to prove that appellant was connected with and was a part of that branch of the general conspiracy which had to do with the receiving, concealing, storing, and disposing of stolen automobiles. If he was criminally connected with any branch of it, either as principal, or abettor, he was guilty of the entire conspiracy. He received, concealed, stored, and disposed of two stolen automobiles, and assisted in disposing of a third one in less than six months' time, all of which were directly or indirectly traced to either Shea or the Baldwins.

We have not set out all the facts in the evidence which pertain to this phase of the subject-matter, but what we have set forth was sufficient to warrant the trial court in submitting to the jury the question of appellant's participation in the conspiracy. On this matter the jury found adversely to appellant, and we cannot disturb that finding.

■ Appellant contends, however, that the evidence does not show that any of the stolen cars with which he was in any way connected were moving as or were part of interstate commerce at the time he was so connected with them. It will be observed that the conspiracy was not only to steal and to transport stolen automobiles across state lines, but it was also to receive, conceal, store, barter, sell, or dispose of such stolen automobiles.

In other words, the conspiracy operated until the automobiles were finally disposed of and lodged in the possession of some person who was not at any stage a party to the conspiracy. If, therefore, the property stolen and transported pursuant to the conspiracy ever became, in furtherance of the conspiracy, a part of interstate commerce, it remained so until it left the confines of the conspiracy. Wilkerson v. United States (C. C. A.) 41 F. (2d) 654. We think the conspiracy was still in operation as to each of the stolen automobiles with which appellant was connected at the time he received, concealed, stored, disposed of or assisted in disposing of them, and hence were still a part of interstate commerce at those times. In order to support a conviction, it was not necessary for the government to prove that appellant knew that such cars were a part of interstate commerce. Kasle v. United States (C. C. A.) 233 F. 878; Rosen v. United States (C. C. A.) 271 F. 651. The trial court properly overruled appellant's motions to strike out the evidence as to each count of the indictments, and properly refused to instruct the jury to find the appellant not guilty.

Appellant insists that the court erred in not instructing the jury, as a matter of law, as to when interstate commerce ceases to be interstate commerce—or, rather, he insists that the uncontradicted evidence shows that the automobiles with which he was connected ceased to be interstate commerce before he received them, and that, as a matter of law, the court should have so told the jury. With this contention we cannot agree. The court properly submitted this question to the jury for determination, as a matter of fact, under all the circumstances of the situations. Appellant made no objection to the instructions and offered no suggestions, and he is in no position now to complain of them.

It is contended by appellant that under section 5 of the National Motor Vehicle Theft Act (18 USCA § 408) jurisdiction is acquired only by the court or courts through or in whose territorial district such stolen motor vehicle has been transported or removed by such offender. In other words, he contends that the court for the Eastern Division of the Northern District of Illinois had no jurisdiction unless it is shown that the original offender transported or removed the stolen automobile in or through the district of that particular court, and that therefore it is necessary for the government to prove who transported the car. This construction is too narrow. The phrase "such offender"

does not refer alone to the original thief or transporter, but refers to the subject of that sentence which immediately precedes that phrase, which is "any person violating this act." Moreover, it may be fairly inferred that each of the stolen automobiles with which appellant was connected was transported, or caused to be transported, into Cook county, Ill., by some unknown person who was a party to the conspiracy. The first count charges a conspiracy between named and unknown parties, and failure to prove the name of the unknown transporter will not prevent a conviction if all other material allegations of the indictment have been proved. It may also be fairly inferred from the evidence that appellant transported, or caused to be transported, the Cadillac car, directly or indirectly, from Chicago to St. Joseph, Mich., and that he transported, or caused to be transported, the Hudson car referred to in count 2 from some other state into Cook county, Ill.; and thus appellant, as to these two cars, might well have been found guilty even under his own construction of section 5.

Judgment affirmed.

ALSCHULER, Circuit Judge.

The situation here is quite different from that in Wilkerson v. United States (C. C. A.) 41 F.(2d) 654, wherein I dissented from the views of the majority. What I there said had reference to an indictment for conspiracy only. The conviction here was upon two indictments, one for conspiracy, and the other for substantive acts. The sentence of imprisonment on the latter was for two years on count 3, and three years on count 4, to run consecutively. The sentence on the conspiracy indictment was for two years, to run concurrently with the two-year sentence on count 3 of the substantive indictment. So, even if conviction upon the conspiracy indictment were not sustainable, the judgment upon the two counts of the substantive indictment, carrying the maximum of the full penalty imposed under both indictments, will stand if supported by the record.

The record here discloses facts and circumstances tending to show that appellant received, concealed, stored, or disposed of, the automobiles moving as, or part of, or constituting, interstate commerce, knowing them to have been stolen; and the question of appellant's guilt upon the substantive counts, as well as on the conspiracy charge, was for the jury.

If, notwithstanding the persuasive incriminating circumstances which the record

discloses, appellant were in fact innocent, his conviction would of course be most deplorable and shocking. But such possibility is ever present, where human judgments are involved, and should behoove men to shun, so far as possible, the appearance of evil, as well as evil itself. A police officer intrusted by his community with the highly responsible function of guarding the public, and thwarting and detecting crime, invites disaster to himself when he takes on a "side line" of trafficking in things which are frequently the subject-matter of criminal conduct. When he does so, he takes a chance of bringing upon himself serious trouble, from which a purpose of "piecing out" an inadequate salary may not serve to extricate him.