## UNITED STATES v. HOLZ et al.
### No. 17333.

United States District Court,
E. D. Illinois.
Oct. 14, 1950.

William W. Hart, U. S. Atty., Ray M. Foreman, Asst. U. S. Atty., Danville, Ill., Ernest R. McHale, Asst. U. S. Atty., East St. Louis, Ill., for plaintiff.

T. R. Johnston, Kankakee, Ill., W. O. Edwards, Danville, Ill., for defendants.

PLATT, District Judge.

In this case defendants Harry Holz and Linda Martin were indicted in the First Count for violation of Section 2421, Title 18, United States Code, and in the Second Count charged with a violation of Section 371, of said Title 18. Count One alleges defendants transported in interstate commerce one Linda Martin from Kankakee, Illinois to Logansport, Indiana with the intent and purpose that the said woman give herself up to prostitution and debauchery and engage in other immoral practices. Count Two charges the two defendants with conspiracy to violate said Section 2421, Title 18 by transporting the said Linda Martin from Kankakee, Illinois to Logansport, Indiana for the said purposes of prostitution. Defendants entered pleas of not guilty. Defendants waived trial by jury and consented to trial by court. At the beginning of the trial, the United States Attorney made a motion to nolle prosequi Count One as to the defendant Linda Martin. This motion was allowed.

Let us review the facts as they appear in the evidence. On behalf of the United States, Mr. and Mrs. Fred Martin testified Linda Martin was a professional prostitute and employed by them at Club 17 on Route 17 east of Kankakee, Illinois for about two or three months during the summer of 1948. They operated the house of prostitution. Defendant Holz visited Linda Martin nearly every day while she was employed at Club 17. When she left Club 17 she went to work for Holz who operated a tavern.

Mildred Arnold testified that on the evening of November 18, 1949 Linda Martin appeared at her home in Logansport, Indiana and requested employment as a prostitute. Mildred Arnold operated a house of prostitution in Logansport, Indiana. Mildred Arnold informed her she would have to obtain a health certificate before going to work. On November 19th defendant Martin arrived at Mildred Arnold's shortly before noon with a large traveling bag and a small train case; that on November 19, 1949.at about 2:30 to 3 p. m. Harry Holz called and came out to the house; that the three of them talked and then for

fear that there might be a raid on the house Linda Martin went back to Kankakee with Holz that night. About March 7, 1950 Linda Martin called her on the telephone from Kankakee and came to her house and worked about five days; that she left the night of March 14th about midnight with Holz. Holz told Mildred Arnold at that time in March that he was driving through from Muncie to his home. Linda wanted a day off and went back with Holz to Kankakee. Between March 14 and March 20 Linda Martin called the Arnold woman by telephone and told her if anybody asked how she had got to her place she came on the train from Chicago.

Charles F. Parrett, Sheriff of Cass County, Indiana, testified that he and the Prosecuting Attorney of that county, Thomas F. Hirschauer, were driving on East Wabash Avenue in the vicinity of Mildred Arnold's home when they saw a Buick automobile stop in front of the Arnold house and let a girl out. The car had no license plates and for that reason it was stopped within two blocks. Holz was driving the car and told Sheriff Parrett someone had attempted to steal his license plates or reflectors, and that was why they were not on the car; that he did not know the girl he left at Mildred Arnold's house; "that they had just been out having a little fun". Holz was arrested to appear in Justice of the Peace Court at 2 p. m. that afternoon. Hirschauer and Parrett then went back to the Arnold home to interview Linda Martin. Parrett testified she said she knew Holz, that he operated a tavern in Kankakee and she worked for him. The Prosecuting Attorney, Hirschauer, questioned Linda Martin. He testified, "I remember she asked if this was routine, that she just had gotten in town. I said, 'No it is not routine'. I asked where she had come from. She said from Kankakee, Illinois. Prior— and then I asked her if she knew Harry Holz and she said yes I do, and then as best I can remember she said she just come with him from Kankakee, Illinois."

Thomas Barksdale, Special Agent of the F.B.I., testified that on March 14, 1950 Berglund, Special Agent of the F.B.I. and Barksdale met Holz at his tavern near

Kankakee, Illinois. They told him they wanted to question Linda Martin about a person she knew. Holz asked who this person was, and they said they would rather not discuss that. Holz told the F.B.I. Agents that he was going to meet Linda Martin in Chicago, and that she would be in town the next day. Arrangements were made to meet Linda Martin and Holz on the evening of March 15th at a tavern in Kankakee; that Berglund and he met Linda Martin and Holz at a tavern. They all then went to the Kankakee police station. Barksdale further testified that Linda Martin told him that on November 18th she took a bus to Chicago and train to Logansport where she met Harry Holz. Later she said Harry Holz took her to Chicago; that she had had an argument with Holz. She said she went to work for Mildred Arnold as a prostitute. In response to a question if Holz took her there she said, "I do as I please. Harry doesn't take me anywhere. I have been around longer than that." Holz told Barksdale he had been in Logansport November 18, 1949 with Linda Martin; that he knew she would be in Logansport, but did not say that he took her over there. Linda Martin further told Barksdale she went to Mildred Arnold's house the next day after examination at a doctor's office. She told Barksdale she had been a prostitute for approximately seven years and was twenty-five years of age. She further told Barksdale that Holz had kept her.

Thomas L. Cooper, physician and surgeon and city health officer of Logansport testified he examined Linda Martin on November 19th. She gave her name as Kitty Martin, address 514 East Wabash Avenue, Logansport, Indiana. The hospital record and report on the blood test introduced in evidence shows that this occurred on November 19th.

Mr. Edgar Donar, clerk at the Lafayette Hotel in Kankakee, Illinois, testified he had known Holz for a number of years; that Holz and Linda Martin registered at the hotel as man and wife many times starting about October 6, 1949; that Holz and Martin registered at the hotel on November 19th at 5 a. m. The records of the hotel

showed that the room they occupied on March 7, 1950 had a telephone call to Logansport that evening. He further testified that John Rockert was the bellboy from 11 p. m. November 18th to 7 a. m. November 19th.

In defense Linda Martin took the witness stand as did Harry Holz. Linda Martin said on November 18th she tended bar for Holz until 1:30 a. m. of November 19th at his tavern at Routes 1 and 17. They were on unfriendly terms because he had not been around; that she left and went to several bars and at one of these she met Holz. About 5 a. m. she and Holz registered at the Lafayette Hotel for a place for her to leave her clothes. They left at 5:30 a. m. or shortly thereafter in Holz' Buick automobile; that they drove to the Union Station in Chicago; she then checked her bags at the Union Station and did some drinking alone. She told Holz she was going to visit friends in Logansport, Indiana; that she called Mildred Arnold two or three days before by telephone and Mildred Arnold said she could use her. Later she testified she called Mildred Arnold from the depot at Kankakee the day before. When she arrived in Logansport she met Holz at the depot; that she told Holz she had some shopping to do. She left the depot in a taxicab. She went to the doctor's office for examination and then to the Walgreen Drug Store. She had made arrangements with Holz to meet her there. Holz met her at the Walgreen Drug Store and drove her to the Arnold place. She did not tell him the type of place Mildred Arnold operated. She had with her an overnight bag and cosmetic case; that she was interviewed by the Sheriff and Prosecuting Attorney but told them she came by train; that the Sheriff questioned her and the Prosecuting Attorney wrote down the answers; that Holz called in the afternoon and came to the Arnold house. She and Holz decided to go back to Kankakee and she went back with Holz in his car. On November 20th she and Holz registered at the Hotel Lafayette in Kankakee about 3 a. m. She paid her own way from Chicago to Logansport on the train. On March 7th she called Mildred Arnold at Logansport to see if she

could use her, and the next day she took a train to Chicago and a bus from Chicago to Logansport and went to work at the Arnold home. The evidence showed there were six or seven houses of prostitution in the vicinity of Mildred Arnold's. On March 14th Holz came to Logansport and drove her back to Kankakee that night. The next evening she met Barksdale and Berglund at a tavern in Kankakee. They drove to the Kankakee police station and there Barksdale interviewed her. She testified she told Barksdale that she went to Logansport on November 19th and not the 18th; that she went to the doctor's office and was examined and then went back to Walgreen's and met Holz. They then drove from the drug store to Mildred Arnold's. She denied the telephone call to Mildred Arnold in which she said that Mildred Arnold should say that she came by train. She further testified she worked at Palm Tavern as a prostitute before she went to Club 17 and that she was at Club 17 about four months.

Holz testified he was married and had two children; that he was twenty-eight years old; that he had been in the tavern business in Kankakee from the time he returned from military service; that he never operated a house of prostitution. He met Linda Martin in the Club 49 in a dice game about three years ago; that he fell in love with her; that they quarreled a good deal. He knew Linda was a prostitute. He had visited her in a house of prostitution. She worked for him off and on at a tavern and they stayed together at the Lafayette Hotel in Kankakee; that he was at the tavern on November 18th when it closed; that they registered at the Lafayette Hotel on the morning of the 19th of November about 5 a. m. His testimony indicates that he had the bellboy get them something to eat and that he gave him a tip. He and Linda started for Chicago about 5:30 a. m.; that he arrived at the Union Station about 7 a. m.; that when they reached 12th Street in Chicago she finally told him she was going to Logansport to visit friends. After he left her at the station he started to drive toward his tavern on Route 41 through Indiana. His tavern was located at Route 1 and 17 in Illinois; that he was in love with the girl and decided to drive to Logansport and meet her. He went to the depot in Logansport and inquired about the arrival of trains from Chicago. There was a train about 11 a. m. or 11:15 a. m. He met her and talked to her. She took a cab and left the station between 11 and 11:30 a. m. He met her at Walgreen's and she had her arms full of packages; she got in the car and they drove to the Arnold home. He let her out intending to go back to Kankakee when he was stopped by the Sheriff and Prosecuting Attorney. He told the Sheriff, in response to a question as to the identity of the girl, that she was a girl he had out. His license plates were on the back seat of the car; that the children had loosened the nuts holding them and he had taken them off and laid them on the back seat. He went to the Justice of the Peace office at 2 p. m. and paid his fine, and this was the first that he knew that Mildred Arnold operated a bawdy-house. Someone at the Justice of the Peace office told him the friend he brought over had earned enough money by this time to pay his fine. He said he didn't bring her over. He then went to Arnold's house, after calling Linda, and after a discussion between the three of them about a raid on the Arnold house they decided that Linda should go back to Kankakee with him that afternoon and she did so. They stayed in the Lafayette Hotel that night together. Berglund and Barksdale came to his tavern on March 14, 1950. He told Berglund and Barksdale that he knew Linda and knew where she was; that Linda had called from Logansport within four days of the time they were there and told him where she was; that he would have her back the next day. (Before she called he didn't know where she was.) Berglund and Barksdale said they were "hot after a man in Indiana that Linda knew". He went to Logansport on March 14th and brought Linda back to Kankakee. They met Berglund and Barksdale in a tavern on the evening of March 15th in Kankakee, and they all went to the police station where they were interviewed.

Barksdale was called in rebuttal and said that Linda Martin told him on March 16th, 1950 in the office of the United States At-

torney at Danville, Illinois that she was in Logansport early in the evening of November 18, 1950; that she went there on the 18th by automobile to Chicago and by train to Logansport, and she didn't say how she got there on the 19th of November; that on the 19th of November she got a physical examination and went to Mildred Arnold's. Barksdale further testified that he and Berglund, the other Special Agent of the F.B.I., told Harry Holz on March 14th that they wanted to talk to Linda Martin about a person she knew; that he wanted to know who the person was and questioned them about it; that neither he or Berglund ever said to Harry Holz that they were "hot after a man in Indiana that Linda knew." Berglund testified and corroborated Barksdale on the conversation with Harry Holz on the 14th of March at his tavern.

John Rockert, the bellboy at the Lafayette Hotel, testified that he was on duty from 11 p. m. November 18th until 7 a. m. November 19, 1949. When Holz and Martin came in they had no baggage. He got something to eat for Holz between 5:30 and 6 a. m. at his request; that he drove Holz' car to the lunchroom to obtain the food; that he took the food to the room that Holz and Martin occupied and that Holz gave him a tip; that Holz had only a towel around him when he delivered the food to the room and Linda Martin was in bed. Holz had requested him to start his car from time to time to keep it warm; that the last time he started the car and warmed it up was at 7 a. m. The hotel records show that Rockert worked at the hotel from 11 p. m. until 7 a. m. on the morning of the 19th of November.

The first proposition is whether Holz transported Linda Martin from Kankakee, Illinois to Logansport, Indiana on November 19, 1949. The law is that the date in the indictment, November 18th, is not material, and defendants have admitted this point in their brief. "* * * Ordinarily, proof of any day before the finding of the indictment, and within the statute of limitations, will be sufficient." Younge v. United States, 4 Cir., 242 F. 788, at p. 793.

There can be no question, after hearing all of the evidence, that Harry Holz drove Linda Martin in his automobile from Kankakee, Illinois to Mildred Arnold's bawdyhouse in Logansport, Indiana and arrived there about 12 o'clock noon November 19, 1949. He was seen stopping at the curb to let her out of his automobile on that date. The date of November 19, 1949 was definitely fixed by the evidence of the government. Defendants admit that the 19th of November was the date.

There are several discrepancies in the testimony of both defendants proving the transportation by Holz. They claim they left the hotel in Kankakee in the Holz automobile at about 5:30 a. m. on the morning of November 19th. The bellboy, John Rockert, tells a plausible story, and they could not have left there according to his testimony until after 7 a. m. If Holz did not drive Linda Martin to Logansport, why did she tell the Prosecuting Attorney she came with him (Holz) from Kankakee? In her statement to Mr. Barksdale, Special Agent of the F.B.I., in her first conversation on March 15th at the police station at Kankakee, defendant Martin said she was in Logansport on the 18th of November; that she went by bus to Chicago and then changed that to say she had driven with Harry Holz in his automobile to Chicago and went by train to Logansport. It is peculiar if she did go by train she would not remember the carrier on which she travelled. The defendant Holz, when he arrived at the Arnold home in Logansport, stopped his car and let Linda Martin out of the car. He did not carry her baggage into the house. She had no baggage when she went to the Lafayette Hotel the evening before. Rockert testified that they had no baggage when they arrived at the hotel in the early morning of November 19th. Linda Martin claims she rented the room to leave her clothes there. Holz further testified that she had some bundles in her arms when he met her at the Walgreen Drug Store. She could not have been carrying two bags. Furthermore, he makes no mention of taking her bags from her at the depot in Logansport and placing them in his car, nor does Linda Martin mention how she disposed of her bags during the trip to see the doctor and then to Wal-

green's to meet Holz. Defendant Martin admits she had two bags when she arrived at the Arnold house. Her baggage must have been in the Holz car from Kankakee to Logansport. The inconsistent testimony of both Holz and Martin again appears in the fact that they testified that Linda Martin took a taxicab when she left the depot, but at the same time, when Linda Martin went to the house of prostitution, she rode from Walgreen's Drug Store with Holz in his automobile, although she did not want Holz to know where she was going, nor her purpose in Logansport. Holz maintains he met Linda Martin between 11 a. m. and 11:30 at the train in Logansport. According to Linda Martin's story, she arrived in Logansport and had a talk with Harry Holz at the depot. She then went to Dr. Cooper's office and was examined; she met Holz at Walgreen's Drug Store with some packages she had acquired along the route and within one-half hour to one hour from the time of her arrival she reached the Arnold home with Holz by 12 o'clock noon. If they left Kankakee by automobile after 7 a. m. they probably arrived in Logansport in time to have Linda examined, complete some shopping, and arrived at the bawdy-house by noon on November 19th. From Kankakee to Logansport by hard road is about 106 miles.

■ It is further not explained in the evidence why Holz started to drive to his place of business which was located on Routes 1 and 17 in Illinois via Route 41 in Indiana, when he suddenly changed his mind and drove to Logansport. A quick glance at a road map of Illinois and Indiana would indicate that it is a shorter paved route to travel Route 1 directly to the tavern at 1 and 17 from the Union Station in Chicago. It is more logical he would have driven directly and then have changed his mind, if he did so.

"Judicial notice will be taken of facts of common knowledge relating to roads and highways." 31 C.J.S., Evidence, § 94, p. 690.

"Distances between points may be of such general knowledge as to make it proper for the courts to take cognizance thereof." 20 Am.Jur., Evidence, § 57, p. 80.

We must bear in mind that if a defendant fabricates a story, that is a further fact inconsistent with innocence. Shama v. U. S., 8 Cir., 94 F.2d 1; Wilson v. U. S., 162 U.S. 613, 621, 16 S.Ct. 895, 40 L.Ed. 1090.

■■ Holz' intent and purpose in taking Linda Martin to Logansport must have been for her to practice prostitution. Intent, motive, or purpose necessary for the establishment of a crime may rest in inference. U. S. v. Reginelli, 3 Cir., 133 F.2d 595. U. S. v. Sorrentino, D.C., 78 F.Supp. 425. Holz knew she was a professional prostitute. She being a professional he certainly did not think she was going to Logansport to follow any other line of work. Cf. U. S. v. Fleenor, 7 Cir., 162 F. 2d 935, at page 941. When he was stopped by the officials in Logansport he told them he did not know the girl he let out of his car at the Arnold home and that it was a girl he had out to have some fun. There was no reason for Holz not to tell the story that he brought Linda Martin to Logansport to visit a friend if that had been the truth. His statement indicated no innocence as to the character of the girl and the kind of house she entered. She actually went to a house of ill-fame. As a matter of fact, he did knowingly transport Linda Martin, knowing her to be a prostitute, knowing that her destination was a bawdyhouse in Logansport, Indiana. "One may be presumed to intend the necessary and natural consequences of his acts. (Citations)" Myres v. United States, 8 Cir., 174 F.2d 329, at page 334; Wright v. United States, 8 Cir., 175 F.2d 384.

■ In a quite similar case, U. S. v. Fleenor, supra, the court held the defendant guilty of the violation of the White Slave Traffic Act. There the women testified that they went by bus from Peoria, Illinois to Evansville, Indiana. They were seen to enter the car with the defendant in Peoria. They registered at the same time at the hotel in Evansville, not a bawdy-house. Within 48 hours the wife of the defendant went to work in a bawdy-house. The Court, after a careful review of the evidence, said 162 F.2d at page 940: "From all these circumstances the jury would well be warranted in not believing the testimony of

these women that they went to Evansville from Peoria by bus, and in believing that the four parties made the trip together in appellant's automobile."

And again at the bottom of the first column, 162 F.2d at page 941, the Court said: "The evidence in this case, supported by the testimony of Sue Kearns, is quite substantial to warrant the jury in believing that appellant's wife was practicing prostitution in Peoria, Illinois, and that he brought her to Evansville, Indiana, for the purpose of there having her engage in her same nefarious work. She was a confirmed prostitute and he knew it. She was continually associating with prostitutes and he knew it, and it was a natural consequence of his taking her to Evansville, that she would again seek work in a house of prostitution, which she did in less than forty-eight hours after their arrival. He was bound to know the natural consequences of his acts."

It is true that Judge Major writes a dissenting opinion in the Fleenor case, but at the bottom 162 F.2d of page 945, the Court there said: "Thus there is no direct proof, as the government asserts, that these four people arrived at the Evansville hotel in defendant's car; at the most it can only be inferred that they did so."

In the instant case we have direct proof that defendants Holz and Martin left Kankakee in the Holz' car, it being admitted in their testimony, and that they arrived in the Holz' automobile at the Arnold bawdy-house before noon on November 19th. Beyond all reasonable doubt Holz is guilty as charged in Count One.

▮ This leaves us with the second proposition as to whether the defendants are guilty of conspiracy as charged in Count Two of the indictment. Defendants have maintained that the evidence of the substantive offense is not sufficient to prove the conspiracy or agreement to commit the overt act. This is a correct statement of the law but is not applicable in the present case, as circumstantial evidence may be shown to prove the existence of an agreement to accomplish the unlawful act. In Reavis v. U. S., 10 Cir., 106 F.2d 982, at page. 984, the Court said: "The crime of conspiracy is in essence two or more

persons combining and confederating with the intent and purpose of committing a public offense by the doing of an unlawful act or the doing of a lawful act in an unlawful manner. It is not essential that the agreement be in any specified form or that any particular words be used. It is enough if the minds of the parties meet and join in an understanding way to accomplish a common purpose. A conspiracy is rarely susceptible of direct proof as conspirators seldom reduce their agreements to writing or make public their unlawful plans. But direct proof is not necessary. The offense may be proved by circumstantial evidence. It may be deduced from statements, acts and conduct of the parties. Telman v. United States, 10 Cir., 67 F.2d 716; Martin v. United States, 10 Cir., 100 F.2d 490."

To the same effect see Madsen v. U. S., 10 Cir., 165 F.2d 507; Calcutt v. Gerig, 6 Cir., 271 F. 220; Wilkerson v. U. S., 7 Cir., 41 F.2d 654; and Loftus v. U. S., 7 Cir., 46 F.2d 841.

And again in Marino v. United States, 9 Cir., 91 F.2d 691, at p. 694, the Court said: "No formal agreement between the parties is essential to the formation of the conspiracy, for the agreement may be shown 'if there be concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose.' "

From the evidence we have already shown beyond a reasonable doubt that Harry Holz committed the unlawful act. He intended to transport Linda Martin from Kankakee to Logansport for her to engage in prostitution. Linda Martin admits and the proof shows that she made the arrangements to go to Logansport, Indiana, to the Arnold house of prostitution and work. She claims she made the arrangements by telephone two or three days before, but the believable evidence indicates she was in Logansport on the 18th of November, 1949 and made the plan. In her zeal to protect Holz she made herself a party to the plan to be transported to Logansport to engage in her profession. She was with Holz drinking at taverns during the early hours of November 19th and registered in a hotel room in Kankakee

198

at 5 a. m. with him. When Holz and Martin left Kankakee they had one purpose, common design, or intention, that is, to drive to Logansport, Indiana so that Linda Martin could go to work in a house of prostitution. She gave her name and address to Dr. Cooper as Kitty Martin, 514 East Wabash Avenue, Logansport, Indiana. The telephone call in March made to Mildred Arnold, after Linda Martin returned to Kankakee from Logansport with Holz on the 14th of March, for Mildred Arnold to tell anyone who inquired that she came by train, would indicate that defendant Martin was not innocent. There is no direct proof, of course, that Linda Martin and Harry Holz designed to violate the White Slave Traffic Act, but the facts and circumstances show beyond all reasonable doubt that they did have a plan and a common purpose conceived before they left Kankakee to violate the Act.

 The substantive count was dismissed as to Linda Martin. Defendants in their brief argue if Linda Martin could not be guilty of the substantive offense then she could not be guilty of conspiracy to commit any offense of which she could not be guilty personally. The legal proposition as to whether Linda Martin could be guilty of violating the substantive offense is not involved in this lawsuit. Granting defendants' premise, a person who is incapable of committing an offense may be guilty of conspiracy to commit the offense. Downs v. U. S., 3 Cir., 3 F.2d 855; Israel v. U. S., 6 Cir., 3 F.2d 743; U. S. v. Trierweiler, D. C., 52 F.Supp. 4. "One who is incapable of committing the offense which is the object of the conspiracy may be criminally liable for conspiracy to commit it." 15 C. J.S., Conspiracy, § 73(b), p. 1105.

For a complete collection of cases on this point, see 131 A.L.R. 1322, at p. 1327, in which Gebardi v. U. S., 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206, is cited.

 Defendants have relied on the case of Gebardi v. U. S., supra, but have misconstrued the holding therein. This case does definitely decide that if the woman merely consents to the transportation for the immoral purpose she cannot be guilty of conspiracy to violate the Act. In the Gebardi

case, supra, 287 U.S. at the bottom of page 117, 53 S.Ct. at page 36, 77 L.Ed. 206, the United States Supreme Court said: "There is no evidence that she purchased the railroad tickets or that hers was the active or *moving spirit in conceiving* or carrying out *the transportation.* The proof shows no more than that she went willingly upon the journeys for the purposes alleged." (Emphasis by this court.)

And again on page 123 of 287 U. S., on page 38 of 53 S.Ct., 77 L.Ed. 206: "We place it rather upon the ground that we perceive in the failure of the Mann Act to condemn the woman's participation in those transportations which are effected with her *mere consent,* evidence of an affirmative legislative policy to leave *her acquiescence unpunished."* (Emphasis by this court.)

In the instant case Linda Martin was the active or moving spirit in conceiving the transportation.

Defendants have also cited in support of this proposition Mackreth v. U. S., 5 Cir., 103 F.2d 495, 496, but at page 496 the Court there said: "There was no substantial evidence tending to show the woman induced the man to cause her to be transported in interstate commerce or did anything more than acquiesce in the immoral relations."

This is a case which follows Gebardi v. U. S., supra, and it cites that case.

In U. S. v. Holte, 236 U.S. 140, at page 145, 35 S.Ct. 271, at page 272, 59 L.Ed. 504, L.R.A.1915D, 281, the Court said: "We see equally little reason for not treating the preliminary agreement as a conspiracy that the law can reach, if we abandon the illusion that the woman always is the victim. The words of the statute punish the transportation of a woman for the purpose of prostitution even if she were the first to suggest the crime. The substantive offense might be committed without the woman's consent; for instance, if she were drugged or taken by force. Therefore the decisions that it is impossible to turn the concurrence necessary to effect certain crimes such as bigamy or duelling into a conspiracy to commit them do not apply."

In 42 Am.Jur., Prostitution, § 18, page 273, the principle is presented as follows: "The rule that an agreement to commit an offense which can be committed only by the concerted action of the persons to the agreement does not amount to a conspiracy does not in all strictness apply where the woman is charged as co-conspirator with the man for violation of the White Slave Traffic Act. The circumstances may be such that she may be guilty of a conspiracy to violate the provisions of the Penal Code relating to conspiracy to commit offenses against the United States apply to the offense created by the White Slave Act, and that consequently the woman subjected to an unlawful interstate transportation may, if a guilty participator, be indicted as a conspirator with the person causing her to be transported."

The court therefore finds that all the necessary and essential facts were proved in evidence under the law applicable herein to establish beyond a reasonable doubt that both defendants are guilty of conspiracy as charged in Count Two of the indictment.